IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No. CR 04-2041 MV

PHILLIP W. MCCOLLUM, KATHRINE
MCCOLLUM KELLY, and CINDY TIETZ

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the *United States' Application and Memorandum of Law for Post-Indictment Order Restraining Withdrawals from the Cash Value of Northwestern Mutual Life Insurance Policy 15-159-482*, filed May 18, 2007 **[Doc. No. 139]**. The Court, having considered the United States motion,[1] finds that it is well taken and will be **GRANTED**.

## BACKGROUND

In the Third Superseding Indictment ("Indictment") filed October 26, 2005, Defendant Phillip McCollum ("Defendant McCollum"), Defendant Kathrine McCollum Kelly ("Defendant Kelly"), and Defendant Cindy Tietz ("Defendant Tietz") are charged with the following offenses relating to an alleged check kiting scheme: (1) ninety counts of bank fraud; (2) one count of conspiracy to commit bank fraud; (3) twenty-eight counts of engaging in monetary transactions

---

[1] The Court notes that under 21 U.S.C. § 853, the statute providing for entry of a restraining order in this case, the Court may grant the United States' motion solely upon application by the United States and Defendants are not entitled to a hearing on this motion. 21 U.S.C. § 853(e)(1); *United States v. Jones*, 160 F.3d 641, 647 (10th Cir. 1998). However, a "post-restraint, pre-trial hearing [may be required,] but only upon a properly supported motion by a defendant." *Id*.

in criminally derived property; and (4) five counts of laundering monetary instruments. Additionally, the Indictment sets forth forfeiture allegations under 18 U.S.C. § 982 for all property, real and personal, that constitutes and is derived, directly and indirectly from proceeds, obtained directly and indirectly, and traceable to the commission of the offenses alleged in the Indictment.

The government alleges that Defendant McCollum and his daughter, Defendant Kelly, were the owners and officers of eighteen Burger King restaurant franchises in Albuquerque, Bernalillo, and Santa Fe, New Mexico. Defendant Tietz was their employee and, among other duties, performed bookkeeping services for them, including conducting certain banking transactions.

Defendants McCollum and Kelly owned the Burger King franchises through five different corporations and held twenty-five bank accounts relating to these restaurants and corporations. Twenty of the bank accounts were with Wells Fargo Bank of New Mexico, N.A ("WFB"), and five were with Bank of Las Vegas ("BLV").

The government alleges that Defendants knowingly and intentionally conspired to execute a scheme to defraud the banks by check kiting in order to pay the expenses of their failing Burger King franchises. In order to fraudulently obtain credit from the banks, Defendants created the false appearance that there were sufficient funds in their accounts to cover withdrawals. Defendants accomplished this by cross-depositing insufficiently-funded checks and electronic transfers among the accounts. The banks were thereby tricked into honoring withdrawals against the accounts. The withdrawals would have caused significant overdrafts had the Defendants not covered those overdrafts with other worthless checks. Thus, Defendants were able to artificially inflate the numerical account balances, and conceal the lack of real funds

available, by taking advantage of a time delay that exists in the banking industry. This delay, also known as "float time," allowed the worthless checks and electronic transfers to be kited for one or more days, during which time Defendants made other illegitimate deposits into the accounts. This allegedly concealed from the banks that the accounts held insufficient funds to cover previous withdrawals.

The alleged fraud occurred between December 1999 and December 2001. The banks discovered the scheme in December 2001 and subsequently froze the accounts at issue. The government alleges that Defendants fraudulently transferred approximately $230,810,801.00, and the banks' total loss is approximately $3.2 million.

In addition, through the Declaration of Special Agent John D. Fay ("Declaration"), which was submitted with the government's present motion, the government asserts that Defendant McCollum and Defendant Kelly used the approximately 3.2 million dollars to pay their salaries and expenses as well as the expenses of their businesses. Included in these expenses were payments to Northwestern Mutual Life ("NWML"), an insurance company. Specifically, funds were used to purchase two life insurance policies from NWML on August 27, 1999. One policy had a death benefit of $1 million and the other policy had a death benefit of $5 million. The $5 million dollar policy is the policy now at issue, and is identified as "NWML policy 15-159-482." In addition to paying death benefits, the two policies were set up in such a way that a portion of the premium paid earned a cash value.

The premiums on the two NWML policies were approximately $100,000 per year. Defendant McCollum paid approximately $8,000 of the premiums per year from his own

accounts.[2] The balance of the premiums, approximately $92,000 per year, was paid via electronic funds transfer. Specifically, from December 1999 until December 3, 2001, monthly premium payments on these policies were sent from BLV to NWML via electronic funds transfer. During the period between December 1999 to December 3, 2001, the relevant BLV account was overdrawn in amounts in excess of the transfers to NWML.

The Declaration further explains that on or about October 7, 2002, Defendant McCollum and his wife canceled the $1 million policy and the cash value of that policy, approximately $48,000, was paid to Defendant Kelly. Subsequently, Defendant McCollum and his wife stopped paying the premium on the $5 million dollar policy. At the time that they stopped payment, the cash value of the $5 million dollar policy was approximately $500,000. At that time, NWML started to take payment for the policy premiums from the cash value of the policy in order to keep the policy in effect. In addition, NWML began to allow Defendant Kelly to take out loans against the policy and take cash out of the cash value of the policy. As a result of these depletions, the cash value of this policy was believed to be approximately $71,000, as of May 14, 2007.[3]

The United States now seeks an order, pursuant to 21 U.S.C. § 853(e)(1), restraining, prohibiting and enjoining withdrawals from the cash value of NWML Policy 15-159-482. The United States does not, however, seek to restrain future premium payments on said policy.

---

[2] Special Agent Fay, in his Declaration, explains that $8,000 is the limit the Internal Revenue Service allows someone to gift to another person without the recipient being taxed.

[3] At a hearing in this matter on May 14, 2007, Defendant Kelly's counsel indicated that premium payments of $25,000 are due every ninety days on NWML Policy 15-159-482 and that he believed a $25,000 premium payment was coming due within the next two weeks.

## **ANALYSIS**

Under the criminal forfeiture provision, "[t]he court, in imposing sentence on a person convicted of an offense in violation of section 1956, 1957, or 1960 of this title, shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). In Counts 92 through 119 of the Indictment, Defendants are charged with violating 18 U.S.C. § 1957, and in Counts 120-124, they are charged with violating 18 U.S.C. 1956(a)(1)(A)(I). Therefore, the forfeiture provisions of 18 U.S.C. § 982 are applicable in this case. Section 982 further provides that forfeitures of property under this section shall be governed by 21 U.S.C. § 853 (other than subsection (d) of that section). 18 U.S.C. § 982 (b)(1).

In turn, 21 U.S.C. § 853(e)(1) authorizes pretrial, post-indictment restraint of property subject to forfeiture if the following two requirements are met: (1) the indictment "charg[es] a violation . . . for which criminal forfeiture may be ordered;" and (2) the government "alleg[es] that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture under this section." 21 U.S.C. § 853(e)(1).

The first requirement has been met, as Defendants have been charged with violations of 18 U.S.C. §§ 1956 and 1957, two sections specifically provided for in the criminal forfeiture provision of 18 U.S.C. § 982(a)(1).

As for the second requirement of 21 U.S.C. § 853(e)(1), the Court notes that the government must merely "allege" that the property at issue would be subject to forfeiture upon conviction.[4] The key to alleging that property would be subject to forfeiture under § 982 is

---

[4]Compare with 21 U.S.C. § 853(e)(1)(B), which governs the issuance of a restraining order or injunction **before** the filing of an indictment or information. In that situation, the government must do more than merely allege that the property will be subject to forfeiture,

alleging that it is "traceable to" the offense. 18 U.S.C. § 982(a)(1). More specifically, the Tenth Circuit has held that "tracing" may be accomplished by simply showing "that the proceeds of [the illegal activity] enabled the defendant to acquire the property . . ." *United States v. Bornfield*, 145 F.3d 1123, 1135 (10th Cir. 1998).

In the present case, the government has sufficiently alleged that proceeds from the alleged kiting activity were used to pay the premiums of NWML Policy 15-159-482. While the court recognizes that some legitimate funds may have been used to fund the insurance policy at issue, the Declaration alleges that the vast majority of the money used to fund the insurance policy at issue came from monies implicated by the Indictment. Simply because those tainted monies may have been mixed with untainted monies does not preclude forfeiture of NWML Policy 15-159-482, so long as such the alleged tainted funds are "traceable." *Id*. The Tenth Circuit has explicitly recognized that "[t]here are several alternative methods [of tracing]; . . . courts exercise case-specific judgment to select the method best suited to achieve a fair and equitable result on the facts before them." *United States v. Henshaw*, 388 F.3d 738, 741 (10th Cir. 2004). Therefore, the Court finds that the government has sufficiently "alleg[ed] that the property with respect to which the order is sought would, in the event of conviction, be subject to forfeiture" and that a restraining order is appropriate under these circumstances. 21 U.S.C. § 853 (e)(1)(A).

**IT IS THEREFORE ORDERED** that the United States' Application and Memorandum of Law for Post-Indictment Order Restraining Withdrawals from the Cash Value of Northwestern Mutual Life Insurance Policy 15-159-482 **[Doc. No. 7]** is **GRANTED.**

---

rather, the government must show a **substantial probability** that it will prevail on the issue of forfeiture. 21 U.S.C. § 853(e)(1)(B).

**IT IS THEREFORE FURTHER ORDERED** that Defendant McCollum, Defendant Kelly, Marjorie McCollum, and any and all beneficiaries of the Phillip W. and Marjorie K. McCollum Irrevocable Trust, and its agents, servants, employees, attorneys, family members and those persons in active concert of participation with them, and those persons, financial institutions, or entities who have any interest or control over the subject property, from attempting or completing any action that would affect the availability, marketability or value of said property, including, but not limited to, selling, assigning, pledging, distributing, encumbering, wasting, secreting or otherwise disposing of, or removing from the jurisdiction of the Court, all or any part of their interest, direct or indirect, in the subject property.  The sole exception is that payments or premiums on Northwestern Mutual Life Insurance Policy No. 15-159-482, may be made from the current cash value of said policy.

**IT IS THEREFORE FURTHER ORDERED** that upon receiving notice of this Order, Northwestern Mutual Life Insurance Company is required to promptly inform the United States as to the cash value of the policy at the time of notice, and thereafter supplement such information by reporting to the United States any changes to the amount of cash value, and by responding promptly to requests by the United States for information on the current status of the cash value of said policy.

**IT IS THEREFORE FURTHER ORDERED** that the United States Marshals, or a designee of the United States Marshals, shall promptly serve a copy of this Order upon Northwestern Mutual Life Insurance Company, and Kathrine McCollum Kelly, as trustee of the Phillip W. McCollum and Marjorie K. McCollum Irrevocable Trust, and make a return thereon, reflecting the date and time of service.

**IT IS THEREFORE FURTHER ORDERED** that this Order shall remain in full force and effect until further order of this Court.

**DATED** this 23rd day of May, 2007.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

<u>Attorney for the United States</u>
Mary Higgins

<u>Attorneys for Defendants</u>
Robert Gorence for Phillip McCollum
Charles Daniels for Kathrine McCollum Kelly
Joseph Gandert for Cindy Tietz